**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**-------------------------------------------------------X**
                                                                               :

**UNITED STATES OF AMERICA,**      :       **19 CR 619 (CM)**

                     **-v-**                              :

**TIFFANY DAYS**                             :

                    **Defendant.**           :
**-------------------------------------------------------X**

## SENTENCING MEMORANDUM

Submitted by:
Xavier R. Donaldson
Attorney for Tiffany Days
1825 Park Avenue, Suite 1102
New York, NY 10035
212-722-4900
xdonaldson@aol.com

**Donaldson & Chilliest, LLP**
**1825 Park Avenue, Suite 1102**
**New York, NY 10035**
**212-722-4900**
**212-722-4966**

April 20, 2021

**VIA ECF and Email**
Honorable Colleen McMahon
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re: *United Stated v. Tiffany Days*
       19 Cr 619 (CM)

Dear Judge McMahon:

  Please accept this letter on behalf of Ms. Days regarding her sentencing to be held on April 29, 2021.[1]

**ANALYSIS OF 18 USC 3553 FACTORS**

  18 USC Section 3553 calls upon this Court to consider specific factors, including the appropriate Sentencing Range, to impose a sentence on a defendant that is "sufficient but not greater than necessary" to comply with the goals of sentencing. *See, 18 USC Section 3553(a).* Indeed, any sentence imposed by the Court must be based upon an individualized assessment based upon the unique factors presented. *See*, *U.S. v. Gall*, 552 US 38, 39 (2007).

  Significantly, the United States Sentencing Guidelines merely reflect a "rough approximation of sentences that might achieve section 3553(a)'s objectives". *See*, *Rita v. United States* 551 US 338, 350 (2007). The Court "may not assume that the Guidelines Range is reasonable." *Gall,* at 50. As the Supreme Court declared in *Nelson v. United States*, 550 U.S. 350 (2009), "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Id*., at 351 (emphasis in original).

---

[1] We are respectfully requesting that this document be accepted after the required time of submission due to several personal and professional matters that caused delay in submission.

After giving both parties an opportunity to argue for whatever sentence they deem appropriate, the District Court should then consider all of the 3553(a) factors to determine whether they support the sentence requested by a party". *U.S. v. Gall*, at 49-50.  It is our opinion that after considering all the factors articulated in 18 USC 3553, a sentence of **60 months** is "sufficient but not greater than necessary" for Mr. Days participation in this criminal conduct.

(1)  NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY OF AND CHARACTERISTICS OF THE DEFENDANT

**Nature and circumstances of the offense**

As the Court is aware, on July 27, 2020, Ms. Days pleaded guilty to Conspiracy to Possess and Distribute cocaine and MDMA, in violation of 21 USC § 841(b)(1)(B). Specifically, Mr. Days, while located in Bronx County New York, did possess at least at least 1 kilogram of cocaine and an amount of MDMA.

While Ms. Days wholeheartedly admits her participation in this conspiracy, Ms. Days would also like the Court to be aware that she was not a member of any organized violent gang like the Bloods, Crips or any variation thereof and although Ms. Days has never received a disciplinary ticket, she has served more than 75 days in isolation (SHU) on this case.

As a result of Ms. Days conviction in this matter, Ms. Days has a statutory incarceratory range of 5 – 40 years and a Guidelines Range of 63 – 78 months.  We are requesting that the Court sentence Ms. Days to **60 months of incarceration and four years of Supervise Release.**

**Characteristics of the Defendant**

Ms. Days was born on December 19, 1980 in Manhattan, New York to Arthur Days and Elizabeth Jones.  Mr. Days is currently unemployed due to a serious back injury.  Ms. Jones works as a child care worker in Brooklyn, New York.  Ms. Days has one sibling, Giovanni Reid, 26, who currently resides in Brooklyn, New York with Ms. Jones and is employed as a manager at a casino Queens, New York.

According to Ms. Days, she never had a relationship with her father because he was arrested when she way extremely young and when he was released from prison, he never sought her out. Ms. Days mother, Ms. Jones, married John Jumbo. Although, Mr. Days never had a relationship with her biological father, Mr. Jumbo treated Ms. Days like she was his own daughter.  Indeed, according to Ms. Days, Mr. Jumbo was a good and decent man who made her life extremely happy.  Unfortunately, Mr. Jumbo and Ms. Jones divorced when Ms. Days was approximately 13 years old and thereafter Ms. Days said her life became miserable.

After the divorce, Ms. Days and her mother moved into an apartment with mother's new boyfriend. This living situation was nothing short of traumatic. Indeed, Ms. Jones new boyfriend was a drug addict and an outright abuser. In fact, Ms. Days indicated that her mother's new boyfriend began raping Ms. Days on a regular basis for several months. Adding pain to an already inhumane condition, Ms. Days informed her mother and her mother called her a liar. It wasn't until Ms. Jones new boyfriend began stealing things from the home in order to satisfy his drug habit did Ms. Jones remove him from the residence. By this time, however, the damage to Ms. Days had been done: Ms. Days had endured two years of trauma at the hands of her now second step-father. At 15 years old, Ms. Days had already endured being raped by her stepfather and verbally and physically abused on a daily basis by her mother. It is no wonder that it was at this age, Ms. Days first turned to the use (and abuse) of marijuana.

Like most abusers, though, Ms. Jones also mentally abused her causing Ms. Jones to then project her anger and frustrations on Ms. Days. On one occasion, Ms. Days told her mother that her legs hurt and Ms. Jones again called her liar until Ms. Days was finally taken to the hospital and it was shown that her legs were broken requiring surgery and six months of extreme therapy and use of a wheel chair.

At age 16, Ms. Days left the home because she "simply could not take it anymore…the verbal abuse, the mistreatment, the name calling…I felt like I was being tortured by my mom…I had to leave…" After Ms. Days left home, she lived with her grandmother temporarily but had to leave her grandmother because her grandmother grew seriously ill and moved down south. Ms. Days thought long and hard about moving back home but decided the trauma was too much to bare. Instead, Ms. Day's jumped from one friend's home to the next until ultimately Ms. Days was homeless.

It was at this point, one of Ms. Days low point, Ms. Days was offered the opportunity to make a little money to support herself—she began using and selling drugs.

When Ms. Days was 21 years old, she met and began dating Tawanna Edwards. At the time Ms. Days met Ms. Edwards, Ms. Edwards was using cocaine and as a consequence Ms. Days began using cocaine as well. Ms. Edwards is the biological mother to their son, Teslone Edwards (14). Currently, Teslone resides in Atlanta, Georgia with Ms. Edwards. When Teslone was first born, Ms. Days stopped using and selling drugs and "wanted to stay clean for the baby." Ms. Days actually voluntarily entered and completed a drug treatment program. Once Ms. Days completed the program, she realized that Ms. Edwards was a bad influence on her and Teslone because she was still using drugs and getting high "waaay too much while we had a kid." Thus, Ms. Days left Ms. Edwards. Notably, Ms. Days won a custody battle against Ms. Edwards and Teslone remained with Ms. Days until she was arrested in this matter. Because Ms. Days mother, Ms. Jones, has severe cancer, Teslone had to be relocated to Atlanta with Ms. Edwards.

After Ms. Days relationship with Ms. Edwards ended, Ms. Days began another relationship with Ms. Nadia Khiroun in 2016 resulting in a marriage. Like her last

relationship, Ms. Days began using and abusing Percoset pills with Ms. Khiroun. The abuse of Percoset during this relationship became almost "necessary to get me away from the stress with her…" Unfortunately, this relationship also ended badly as Ms. Days indicates that Ms. Khiroun was abusive, threatening and simply used Ms. Days to acquire citizenship. The depression from the relationship with Ms. Khiroun caused Ms. Days to lose her job, get evicted from her apartment and caused her to become homeless again. Ms. Days indicated that her divorce and depression was so severe that she sought counseling from a professional. After her visit with a psychiatrist, Ms. Days was prescribed medication to help her cope with her depression.

Ms. Days continued using cocaine and Percoset until her arrest in 2019.

**Afford adequate deterrence to criminal conduct**

Ms. Days completely accepts and understands the seriousness of this crime. Moreover, like many other similarly situated individuals, Ms. Days faces significant collateral consequences as a result of this federal felony conviction. Indeed, because of this federal conviction, Ms. Days will not be able to obtain certain state or federal licenses, he will forever be labeled a federal felon, he will be denied significant employment opportunities making upward mobility significantly more challenging, he may be denied certain federal governmental benefits, he may be denied certain home loans or other economically advantageous avenues as well as denial of certain housing opportunities.

A *60 month sentence and a term of supervision* along with the significant collateral consequences attendant to this first federal criminal conviction will serve to deter Ms. Days and any similarly situated person from participating in similar conduct. Indeed, Ms. Days has shown that she wants to and can be a productive member of society by obtaining her GED, securing employment on several occasions and raising a son by herself.

We appreciate the Government's anticipated argument that Ms. Days has not learned her lesson and that a Guidelines sentence is justified because: Ms. Days has been arrested and convicted several times; that she has served prison time in the past; and that she has violated release provisions. We appreciate and respect those arguments. We would note that Ms. Days has never been sentenced to five years of incarceration and definitely has never served any jail time that would come close to the inhumane time Ms. Days has served in MCC and MDC.

Moreover, the Guideline Range in this circumstance took all of those considerations into account and our request is but **three months** lower than the Guidelines Range.[2] Additionally, no one ever anticipated that anyone would be in

---

[2] We would note that it is extremely common for Courts in this District to vary downward from the Guidelines Range involving convictions for narcotics.

jail/prison under the current inhumane conditions that Ms. Days has experienced for over eighteen (18) months with a significant amount of time spent in *isolation*.

An extended sentence of prison **(over 60 months)** however, would seem to serve the opposite effect on Ms. Days as we believe that society is not served in any productive way by incarcerating Ms. Days for more than five years. Put another way, society is not better served with Ms. Days inside of a federal prison for more 60 months. Rather, society would be better served with Ms. Days sentenced to 60 months, released, paying taxes and helping to raise her young son.[3]

**Protect the public from further crimes of the defendant**

Rehabilitation begins after a person is incarcerated related to criminal activity. In this case, while in BOP custody, Ms. Days specifically took steps to better prepare herself for life once she is released. Specifically, while in federal custody, Ms. Days has received certificates for participating in the following courses/workshops: "Inmate Companion"; The Focus Forward Project"; "Alternatives to Drug Dealing"; "Square One"; "Trauma in Life Workshop"; "Women in the 21st Century Workplace"; "Creative Arts: This is Joe Light"; "Philosphy: James Baldwin"; "Philosophy: The Water Dancer"; "Creative Arts: This is Bisa Butler"; "Philosophy: Equality"; "Creative Arts: This is Yayoi Kusama"; "Philosophy: Excerpt from The Water Dancer"; "Philosophy: My Spanish"; and "Creative Arts: This is Toyin Ojih Odutola".

Most notable in Ms. Days desire to better herself is also her desire to help others while she has been incarcerated under these inhumane and unusually harsh conditions. Specifically, Ms. Days indicated that she really appreciated and learned a lot in the "Focus Forward Project" but she found herself feeling a purpose while being an "inmate companion" for more than 18 months. The "inmate companion" program allowed Ms. Days to actually help others and according to Ms. Days notwithstanding her conviction "I really am a good person Mr. Donaldson…I genuinely like helping people… and when I get out that's exactly what I am going to do…this place is the worst but it showed me that I ain't never coming back here again…".

Mr. Days also understands that her involvement in this conspiracy has major consequences including a life long stigma of being a convicted federal felon. It is our understanding, however, that Ms. Days maintains family support. Indeed, the "single best predictor of successful release from prison is whether the former inmate has a family relationship to which he can return…" *"Recidivism and Parental Engagement", supra,*

---

[3] Ms. Days son is currently living with his mother in Atlanta, Georgia. Before Ms. Days was arrested in this case, the Court awarded custody of their son to Ms. Days because the biological mother was not deemed fit to raise the young man. After Ms. Days was arrested, her son lived with Ms. Days mother. Unfortunately, Ms. Days mother grew to ill to take care of Ms. Days son and consequently, Ms. Days son was sent to his biological mother in Atlanta. One of Ms. Days priorities after release is to immediately secure custody of her son and ensure that he is a proper environment.

at 196-197. As indicated by the letters provided in support of Ms. Days, she will have support upon her release.

Notably, prior to Ms. Days being incarcerated on this case, Ms. Days enjoyed a healthy relationship with her son, brother and mother.  In fact, prior to her arrest on this case, Ms. Days was assisting her mother because of her cancer diagnosis.  Prior to the gun and COVID lockdown, Ms. Days enjoyed significant contact with her family members.  Of course, after the Gun and COVID lockdown, Ms. Days was not allowed almost any contact. To Ms. Days this made jail time double as bad: even convicted criminals should be allowed consistent contact with their family. In fact, contact with one's family, in this writer's opinion, is essential to rehabilitation. The last 14 months was not only punishing and a deterrence because it was "jail" but also because Ms. Days was isolated from her support structure.  This will change when she is released as many people are anxiously willing to participate in ensuring that Ms. Days becomes and remains a productive member of society.

**Provide defendant with needed educational, vocational, medical care or other treatment**

Although Ms. Days did not receive her high school diploma, she did earn her GED.  Additionally, Ms. Days has a decent work record indicating that Ms. Days is willing to work.  Indeed, Ms. Days was employed from 2010 – 2014 as a maintenance worker; for several months in 2015 at Macy's; for approximately a year in 2016 as a delivery driver; and for almost a year before her arrest as a home health care aid. In other words, Ms. Days has no problem working!

Moreover, as indicated above, while incarcerated, Ms. Days has participated in several workshops specifically designed to help prepare her to be productive when she is released. Essentially, it is crystal clear that Ms. Days wants to do better. Ms. Days wants to be better.  As such, we would suggest that the Court strongly urge the Bureau of Prisons to allow Ms. Days to participate in any vocational or educational courses that would allow her to increase the possibilities of a successful re-entry into society upon her release.

Additionally, as the Court is aware, Ms. Days was abusing cocaine and Percoset immediately prior to her arrest and incarceration in this matter which we believe played a role in her participation in this case.  Consequently, we are asking the Court to strongly recommend that Ms. Days be allowed to participate in any and all available Drug Treatment programs including RDAP and that Ms. Days be housed in a facility as close to New York City as possible.[4]

---

[4] We believe that Ms. Days is currently enrolled in a drug program and it would be extremely important that Ms. Days is allowed to continue this program at a BOP facility or graduate to the next level of the program to ensure the best results of the programming attendant to drug programs.

## BELOW GUIDELINES SENTENCE DUE TO "GUN LOCKDOWN" AND COVID-19

Many inmates at MCC have experienced the "gun lockdown" and subsequent COVID lock down.  We believe Ms. Days experience, however, is especially severe and significant and distinguishable from most.  Ms. Days indicates that she was not allowed to shower; she was not provided clean linen; she was served expired food; she had to wear used menstrual items because none were provided on a consistent basis; she endured floods in her cell that were ankle high with feces that backed up from the toilets; **grew extremely ill**; and she lived with rodents.  Moreover, she endured approximately 75 days of imprisonment in the Special Housing Unit (SHU) simply because she was an inmate at MCC and not due to any disciplinary infractions.[5]

She was placed in isolation commonly known as the SHU for more than 75 days. Notably, this isolation/SHU was not punishment but simply because MCC thought she had COVID and because MCC had other random lockdowns. Ms. Days has been in the SHU so much that she now has permanent mental damage: she is literally afraid of closed environments. Every time a guard comes to her cell she literally begins to shake for fear that she is going to placed in the SHU. When a doctor comes in the unit, she again grows anxious and shakes because she believes she is about to placed in the SHU.  While in the SHU, she began to scream at the silence and darkness. On some days while she is simply sitting in her dorm setting, she wants to scream because she is afraid.[6]

As the Court is aware, Ms. Days was arrested in August of 2019. Prior to that arrest, Ms. Days saw her family members every day.  More importantly, Ms. Days spent time with and spoke to his son every single day.  Even though she was committing criminal activity, Ms. Days was very close to her family.  After she was detained pursuant to this case in August of 2019, her close contact with her family continued.  In fact, the close contact Ms. Days had with her family is what helped her thru the lonely days and harsh nights at the infamous MCC facility. Almost every day from August 2019 to February 2020, Ms. Days spoke to her son.  Almost every week from August 2019 to February 2020, Ms. Days received a visit from a family friend.  Prison is supposed to be punishment but humane.  In those months, even though incarcerated, Ms. Days at least felt like a human being.

Unfortunately, after February 2020, MCC was placed on a complete lockdown due to an alleged firearm being found inside of the facility. This "gun lockdown" was 24 hours per day for approximately 2.5 weeks. During this "gun lockdown", Ms. Days was

---

[5] To be clear, in over 20 months of incarceration, Ms. Days did not receive a single disciplinary ticket which is another example of her significant steps toward a productive lifestyle.

[6] The main reason Ms. Days does not want to be sentenced in person is because upon her return to MDC, she will have to placed in the SHU for approximately 14 days.  Again, Ms. Days has spent over two (2) months inside of the SHU without ever being given a infraction or being alleged to have done anything wrong.

not allowed to leave her cell, was only allowed to shower 3 times in 2.5 weeks, was allowed to sparingly change her clothes, was not given any phone calls and was not given any visits. She was completely cut off from society.  Each hour felt like 2 hours and each day felt like 2 days.  But then things got worse.

A few weeks after the "gun lockdown" was complete, COVID-19 arrived with a vengeance. There can be no doubt that March 2020, the month COVID-19 became a reality in this Country, forever changed incarceration for defendants in the United States. The measures necessary to slow the progress of the disease – social distance, masks, adequate hygiene – were and still are impossible inside a prison. Crowded into small areas, communal dining, sleeping in close quarters, toilets shared by dozens of inmates, phones passed from one inmate to another, shared computers, no sanitizing wipes, limited soap and cleaning products are rampant in prisons across the United States.  Due to COVID-19, jail conditions which are objectively harsh anyway, became even more harsh. MCC was not spared.

During this COVID-19 pandemic, Ms. Days experienced several lock downs, limited attorney visits, no family visits, limited showers and often times no clean clothes. Moreover, the complete and daily anxiety that Ms. Days experienced while being locked in a "petri dish" type environment is unimaginable.  The public were able to stay home, social distance, change their masks, choose what toilet to use, wash their hands as much as possible and to avoid people.  Ms. Days was unable to do any of that.  Most importantly, for the last thirteen (13) months, Ms. Days has been unable to *see or touch* any of her family members, especially her son.  To be clear, for several months at a time, in the most humane and "just" country on earth, Ms. Days was not able to speak to or see her son, mother or brother.  This circumstance, a sharp departure from Ms. Days's former daily routine, made the last 13/14 months of incarceration absolutely excruciating.  There is no wonder why **Judge Oetken in United State v. Daniel Gonzalez, 18 Cr. 669, (JPO), 4/2/21, Dkt 249 *(transcript unavailable at this time) commented during Mr. Gonzalez recent sentencing proceeding that time served during COVID should count at least 1.5 to 2 times actual time.*** We wholeheartedly agree.  While we are not seeking a downward departure due to the "gun lockdown" and COVID-19 pandemic, we definitely believe that Ms. Days's incarceration during the "gun lockdown" and pandemic warrants a significant downward variance and she should be credited at least 1.5 days for every day she served from February 2020 to her sentencing.

Indeed, several Courts in this District have reduced sentences based on the pandemic and unduly harsh pretrial conditions of detention. See e.g., *United States v. Juan Carlos Aracena de Jesus*, 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020) (substantial downward variance from 30 to 37 months to six months in part because of the "horrific conditions" at MCC during the pandemic). See also, *United States v. Morgan*, 19 Cr. 209 (RMB)(S.D.N.Y. May 5, 2020)(cutting the sentence to less than half of the low end of the Guidelines based in part on conditions at MDC during the pandemic and condemning the conditions at MCC and MDC prior to the current crisis); *United States v. Dayss*, 19 Cr. 863 (VSB),(S.D.N.Y. May 4, 2020)(reducing the length of the sentence in part based on

conditions at MCC during the COVID-19 crisis); and *United States v. Pierson*, 14 Cr. 855 (LTS)(S.D.N.Y. May 4, 2020)(same for defendant detained at MDC).

To be sure, the future in the penal system does not look bright for inmates: cleanliness and social distancing will remain difficult, if not impossible, and while there does appear to be vaccinations becoming available to inmates, it appears in some jurisdictions, inmates are last to receive them.

## **CONCLUSION**

Ms. Days admittedly and wholeheartedly admits her guilt, sincerely regrets his participation in this conspiracy and stands prepared to be sentenced to a federal felony that will undoubtedly alter his future. To be clear, we also believe that a sentence of **sixty months** is the appropriate sentence in this matter for the following reasons:

- Ms. Days will suffer significant collateral consequences;
- Ms. Days has served over 14 months in jail under severely harsh, unusually cruel and inhumane conditions due to the "gun lockdown" and the COVID-19 pandemic;
- Ms. Days was not able to see or speak to her family for months at a time;
- Ms. Days has a sought and participated in a number of programs while incarcerated at MCC and MDC;
- Ms. Days completed the Focus Forward program;
- Ms. Days has been an Inmate Companion for more than 12 months;
- Ms. Days has significant family support;
- Ms. Days was not involved in or part of a violent gang; and
- Ms. Days served 75 days inside of Special Housing Unit causing significant mental anguish and trauma.

Respectfully submitted,

/s/ ***Xavier R. Donaldson***

Xavier R. Donaldson
Attorney for Tiffany Days

cc: Assistant U.S. Attorney
via email